IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Cheree Strickland, | ) | Civil Action No. 2:11-2566-RMG-BHH |
| Plaintiff, | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE** |
| Acevedo Restaurants Inc., | ) | |
| Defendant. | ) | |

This matter is before the Court on the defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 pursuant to Federal Rule of Civil Procedure 56. [Doc. 33.] The plaintiff has plead claims for hostile work environment and for retaliation, pursuant to Title VII of the Civil Rights Act of 1964, as amended, and the South Carolina Human Affairs Law.

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are referred to a United States Magistrate Judge for consideration.

**FACTS PRESENTED**

The plaintiff began working as a cashier for Acevedo Restaurants at their Ashley Phosphate Road, McDonald's location, on August 8, 2008. (Pl. Dep. at 101.) The plaintiff claims that her manager, Barney Hudson ("Hudson"), on a daily basis, created a sexually hostile environment by subjecting her to inappropriate sexual advances,

1

comments, and touching, over a ten month period. The Court will discuss such alleged harassment in more detail below.

The plaintiff confronted Hudson about his behavior and reported his conduct to other on-site management. Additionally, the plaintiff alleges that she called the defendant's corporate office and spoke to a "Lou Ann" (presumably Lou Ann Blakely, Supervisor) to complain about Hudson. (Pl. Dep. at 178.) Blakely denies that she ever received a call from the plaintiff. (Blakely Dep. at 17.)

Ultimately, the plaintiff complained to Assistant Manager, Fred Paden, about a sexually explicit text message she read, allegedly from Hudson. (Pl. Dep. at 117-18.) Within a couple days of this complaint, the plaintiff's employment was terminated by Hudson, himself. (Pl. Dep. at 122.)

## APPLICABLE LAW

Federal Rule of Civil Procedure 56(c) states, as to a party who has moved for summary judgment:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of

2

the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings. Rather, the non-moving party must demonstrate that specific, material facts exist which give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. Furthermore, Rule 56(e) provides in pertinent part:

> When a motion for summary judgment is made and

3

> supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). Accordingly, when Rule 56(e) has shifted the burden of proof to the non-movant, he must produce existence of every element essential to his action that he bears the burden of adducing at a trial on the merits.

## DISCUSSION

### I. Hostile Work Environment Claim

The plaintiff first contends that the actions of Hudson created a hostile work environment for which the defendant is liable. The defendant rejects that it is.

To establish a hostile work environment claim, the plaintiff must prove by a preponderance of the evidence that he was subjected to (1) unwelcome harassment; (2) based on his sex; (3) that is sufficiently severe or pervasive to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001). The defendant contends that the plaintiff cannot establish either the third or the fourth elements of her *prima facie* case.

#### 1. Severe or pervasive

The "severe or pervasive" element of a hostile work environment claim "has both subjective and objective components." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325,

4

333 (4th Cir. 2003) (en banc).  First, the plaintiff must show that he "subjectively perceive[d] the environment to be abusive."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993). Next, the plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment objectively hostile or abusive. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998).

As to the subjective element, issues of fact exist as to the plaintiff's subjective impression.  The plaintiff has offered evidence that she perceived the conduct, described in more detail below, as sexual in nature (Pl. Dep. at 117-18, 145); that it made her feel uncomfortable and that she could not handle it (Pl. Dep. at 109, 117-18, 161); that she was "bl[own] away" by it (Pl. Dep. at 151); that she was forced to leave the room on occasion (Pl. Dep. at 172-73); and that she took a night shift position to avoid the harassment (Pl. Dep. at 159).  She alleges to have confronted Hudson about his behavior and complained to her assistant manager and human resources.  (Pl. Dep. at  117-18, 122, 155, 158, 177-78.)  A reasonable jury could conclude, based on this evidence, that the plaintiff subjectively perceived the harassment as severe or pervasive.  *See, e.g., Spriggs*, 242 F.3d at 185-86 (finding a victim's complaints to supervisors about harassment shows he believed the environment was hostile or abusive).

As to the objective severity of the harassment, it "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances,'" giving "careful consideration of the social context in which particular

5

behavior occurs and is experienced by its target." *Oncale*, 523 U.S. at 81; *see also Harris*, 510 U.S. at 23 (warning whether a hostile environment actually existed "can be determined only by looking at all the circumstances"). "There is no mathematically precise test" for determining when a hostile or abusive work environment exists. *Harris*, 510 U.S. at 22. The circumstances that should be considered include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). But, "'no single factor is' dispositive." *Sunbelt*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23).

In order to be actionable, the harassing "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Id*. (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." *Id*. It has stated, therefore, that the "task then on summary judgment is to identify situations that a reasonable jury might find . . . instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere." *Id*. (quoting *Jennings v. Univ. of North Carolina*, 482 F.3d 686, 695 (4th Cir. 2007). Critically, "whether harassment was sufficiently severe or pervasive to create a hostile work environment is 'quintessentially a question of fact' for the jury." *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 199-200 (4th Cir. 2000) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 243 (4th Cir. 2000)).

As to the frequency of the conduct, the plaintiff has testified that she was sexually harassed by Barney Hudson on a daily basis. (See Pl. Dep. at 141-42.) The defendant resists the efficacy of this testimony and argues that more specificity is required to establish such frequency. But, the plaintiff has recounted numerous detailed incidents, as will be discussed below, and it does not seem impermissible that she would offer her own testimony that such conduct essentially happened on a daily basis, even where she cannot recount each such incident. More importantly, the plaintiff did offer at least one specifically recurring item of harassment. Namely, she contends that on "a daily basis" Hudson would comment on how her "butt fit her pants." (Pl. Dep. at 161.) Of course, as counsel for the defendant himself has threatened, the plaintiff may be questioned at trial about any details once forgotten but later conveniently remembered. (Pl. Dep. at 143.) But, it does not seem to the Court a credibility determination that can be made at summary judgment. The plaintiff has given specific instances of harassment that seem to reasonably buoy a more generalized statement of testimony that there was a good bit more even if not well recalled. And, she claims he commented on her rear end almost daily. (Pl. Dep. at 161.) Her testimony is probative and sufficient to create issues of fact that the conduct was significantly more frequent than the very circumscribed number of five or so incidents the defendant would hold her to (which, the Court would add, is not insubstantial or infrequent either over a ten month period).

As to the severity, there is good evidence of outrageous and humiliating conduct. On one occasion, Hudson allegedly touched the plaintiff's rear end, rubbed his body against it, and proceeded to make sexual grunting noises making the plaintiff extremely

7

uncomfortable. (Pl. Dep. at 143-44.) The plaintiff asked Hudson why he had touched her and he responded, "Ah, you know you liked it." (Pl. Dep. at 143-144.) On another occasion, Hudson made a comment about the plaintiff's pants and how they fit her in the vagina and rear end areas. (Pl. Dep. at 146.) As mentioned, Hudson would comment on the way the plaintiff's rear end fit in her pants on a daily basis. (Pl. Dep. at 161.) She testified that he would say things such as "Woohoo, look at that fat a** in them pants" or "Look at how she fills them pants out in the front, that's what I like to see." (Pl. Dep. at 165.) Hudson would tell the plaintiff to tuck in her shirt, but because she felt uncomfortable she would attempt to avoid tucking in her shirt for fear of additional comments about the way her pants fit her. (Pl. Dep. at 109.)

The plaintiff has also testified that, one day while she was counting her cash register drawer, Hudson said to the plaintiff, "You know you like them big dicks. You know you like it rough like that. You know how them redheads from Pembroke is." (Pl. Dep. at 150-151.) The plaintiff asked Hudson why he would say something like that and he responded by saying, "You know, because your boyfriend is black, you know all about them big dicks." (Pl. Dep. at 151-152.) In September 2008, the plaintiff confronted Hudson about his conduct. "He told me he could talk to me any f***ing way he pleased, he was the store manager, and if I didn't like it, I could get the hell off his clock and go home." (Pl. Dep. at 155.)

It is alleged that Hudson continued with his sexually harassing comments when, while he was talking to another employee about an ex-girlfriend of his from Pembroke, he said about the plaintiff as she was walking by: "You know, she's from there too, you

8

know. She's probably wild like that. She could probably ride rough and have great hot sex and wild sex." (Pl. Dep. at 173-174.)

When a night shift position subsequently opened up, the plaintiff alleges to have immediately taken it to avoid having to work with Hudson. (Pl. Dep. at 159.) During that shift the plaintiff asked the assistant manager if she could borrow her cell phone. (Pl. Dep. at 116-18.) When the plaintiff went to use the cell, a sexually explicit text message appeared on the screen concerning the plaintiff. (Pl. Dep. at 116-18.) Specifically, the text message stated, "Why don't you bring Cheree [the plaintiff] home for a threesome." (Pl. Dep. at119.)

The plaintiff also claims that Hudson told an Assistant Manager, Fred Paden ("Paden") to instruct the plaintiff to get down on her knees and scrub a certain area by the sink so that he could look at her butt. (Pl. Dep. at 187-89.)

With citation to numerous other precedents, the defendant would try and diminish these allegations of harassment, equating them either to some kind of permissible work place vulgarity or simply too infrequent. This is not the most outrageous case this Court has seen or that there ever has been, certainly. But, the implication that the allegations are within some kind of acceptable window of workplace conduct, which must be tolerated, is, respectfully, outlandish. The Court can imagine another judicial officer having some question about the frequency of conduct, as an evidentiary matter. That issue is a somewhat closer call. But, to attempt to characterize the alleged misconduct as somehow an acceptable incident of the normal work environ, severely misses the legal mark. The conduct, if true, is both reprehensible and actionable. Besides the

9

substantive crassness of the behavior, it was specifically about the plaintiff, specifically about her body, and, in certain circumstances, an assault.

Most of the cases cited by the defendant involved non-sexual put downs or subtle innuendo or generalized gender slurs or too harsh discipline. (See Def. Mem. Summ. Summ. J. at 12); *see Black v. Zaring Homes*, 104 F.3d 822 (6th Cir. 1997); *Kidwai v. McDonald's Corp.*, 1994 WL 13697 (4th Cir. April 18, 1994.); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033 (2d Cir. 1993). Even in *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993), where the plaintiff was kissed and her leg was rubbed, the Court noted there were only two incidents and harassing stopped once rebuffed. Here, the plaintiff has alleged five or six specific instances in addition to daily comments. Moreover, to cite a case suggesting that the plaintiff, here, might suffer Victorian delicacies for her reaction to Hudson is an extreme failure of precedential analog. *See Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir. 1995). Observations about the accentuation of female genitalia in various apparel or the use of the word "d*ck" in reference to the relative prowess of black males is not "American television" as the defendant has the audacity to argue.[1]  Neither is one groped by virtue of prime time viewing.

The defendant argues that the plaintiff has admitted that she never felt physically threatened by Hudson and that at all times she was able to do her job and that her performance was not affected by any of the alleged harassment. (Pl. Dep. at 96 - 97,

---

[1] The undersigned is neither prudish, nor unaware of the increasing explicitness of television, cable and network. The specific language alleged, however, cannot be reasonably characterized as representative of acceptable television norms.

200.) The defendant emphasizes that she mostly stayed in her work area (which was the back drive through window) and that she did not fraternize or socialize with her coworkers and that she largely kept to herself the whole time she was at work. (Pl. Dep. at 97.)

These are overstatements, at best. While she has essentially said some of the things argued, taken together, the plaintiff's testimony belies any view that she was unaffected in her work. As discussed previously, the plaintiff has responded with evidence that she perceived the conduct to be sexual in nature (Pl. Dep. at 117-18, 145); that it made her feel uncomfortable and that she could not handle it (Pl. Dep. at 109, 117-18, 161); that she was "bl[own] away" by it (Pl. Dep. at 151); that she was forced to leave the room on occasion (Pl. Dep. at 172-73); and that she took a night shift position to avoid the harassment (Pl. Dep. at 159). Also, there is evidence that the plaintiff would not tuck in her shirt to avoid comments from Hudson and that she was warned formally about not doing so. (Pl. Dep. at 109.) Ironically, the fact that the plaintiff stayed in her work area and would not socialize is arguably proof of precisely the opposite point the defendant would make. She did not have a normal work relationship or environment.

Regardless, no single factor is dispositive. *See Harris*, 510 U.S. at 23. But, taken together all of the *Harris* considerations suggest that issues of fact exist as to whether the alleged harassment was sufficiently severe or pervasive. The record includes evidence that the harasser (1) went "out of [his] way to disgust [the plaintiff] and make her uncomfortable by graphic demonstrations of sexual acts," *Ocheltree*, 335 F.3d at

11

328; (2) subjected her to what a reasonable individual may have considered demeaning remarks about her sexuality, *see Spriggs*, 242 F.3d at 184-86 (racial epithets); *Sunbelt Rentals*, 521 F.3d at 311); and (3) subjected her "to frequent comments about her body" and his, *see E.E.O.C. v. R & R Ventures*, 244 F.3d 334, 337-38 (4th Cir. 2001). *Ziskie v. Mineta*, 547 F.3d 220, 228 (4th Cir. 2008). Based on the quality, quantity, and frequency of the remarks, the Court thinks a jury could find the comments severe. The incidents involve strongly course and repeated language and physical touch, which directly implicated the plaintiff in sexual conduct with the alleged harasser.

### 2. Imputed Liability

The defendant also contends that the plaintiff cannot show that any such alleged conduct of Hudson should be imputed to it. Recently, the United States Supreme Court resolved a circuit split ruling that "an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State University*, 133 S. Ct. 2434, 2443 (U.S. 2013 (citation and quotations omitted). The defendant has not alleged that Hudson lacked such authority; indeed, he apparently exercised it.

Thus, when a qualifying "supervisor" engages in harassment that does not result in a tangible employment action, the employer may raise what is known as the *Ellerth/Faragher* affirmative defense. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S.

742 (1998), and *Faragher v. Boca Raton*, 524 U.S. 775 (1998). Specifically, an employer can mitigate or avoid liability by showing (1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided. *See Faragher*, 524 U.S. at 807; Ellerth, 524 U.S., at 765.

Here, the defendant argues that the plaintiff failed to inform anyone of the alleged harassment. And, notwithstanding some of the defendant's word smithing of the evidence, issues of fact plainly exist as to her complaints about Hudson. First, she confronted him directly about it: "He told me he could talk to me any f***ing way he pleased, he was the store manager, and if I didn't like it, I could get the hell off his clock and go home." (Pl. Dep. at 155.) The plaintiff also complained to "Tammy," an assistant manager who replied, "That's just Barney. If he didn't like, he wouldn't mess with you like that." (Pl. Dep. at 158.) Eventually, she began asking around to other employees about a telephone number for corporate to call and report the conduct. She alleges to have called and spoken with a woman named Lou Ann. (Pl. Dep. at 177-178.) The plaintiff alleges that she unfortunately knew that Lou Ann spoke with Hudson, because shortly after she made the phone call to complain, Hudson confronted her and yelled at her. (Pl. Dep. at 178.) Hudson allegedly told her that if she ever called corporate on him again that he would fire her "mother-f***ing ass." *Id*. The plaintiff did not report this incident because she was terrified of losing her job after being threatened for calling. (Pl. Dep. at 178.)

Finally, the plaintiff complained to Assistant Manager, Fred Paden, about the text

message she saw. (Pl. Dep. at 117-18.) She alleges that she was told by Paden to clock out and go home; he told her that he would talk to someone about her complaints of sexual harassment. (Pl. Dep. at 115.) Just days after, the plaintiff went into the store to pick up her paycheck and was asked by Paden if she had her shirt with her. (Pl. Dep. at 122.) The plaintiff asked why and Paden told her that Hudson informed him that he was to terminate the plaintiff's employment. *Id*. The plaintiff was not given a reason at that time for her termination. (Pl. Dep. at 122.)

Notwithstanding the defendant's own reasons for dismissing the plaintiff's account, a jury might believe her even still. And, if the plaintiff's notice is found legally effective, the defendant can only avoid liability by demonstrating that it took immediate and appropriate corrective action to stop the harassment. *See, e.g.*, 29 C.F.R. § 1604.11(e); *Howard*, 446 F.3d at 567. There is evidence that the defendant knew of Hudson's conduct and not only did nothing about it but fired her instead.

The sexual harassment claim should continue.

## II.     Retaliation

The defendant also challenges the plaintiff's contention that she was retaliated against for having complained of the alleged sexual harassment. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of [its] employees . . . because he [or she] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The *McDonnell Douglas* burden shifting scheme, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies in analyzing retaliation claims under Title VII. *Smith v. First Union Nat'l*

*Bank*, 202 F.3d 234 (4th Cir. 2000). The plaintiff does not attempt to use direct evidence to establish his claim of retaliation.

### A.   *Prima Face* Case

In order to establish a *prima facie* case of Title VII retaliation, the plaintiff must prove three elements: (1) that she engaged in a protected activity, (2) that an adverse employment action was taken against her, and (3) that there was a causal link between the protected activity and the adverse employment action. *See EEOC v. Navy Federal Credit Union,* 424 F.3d 397, 406 (4th Cir. 2005); *Mackey v. Shalala*, 360 F.3d 463, 469 (4th Cir. 2004).

The defendant contends that the plaintiff cannot establish the third element of her *prima facie* case. But, truthfully, the defendant does not make any serious challenge to the plaintiff's claim; the Court easily finds it should survive. Specifically, both the defendant and the plaintiff focus mostly on prior complaints by the plaintiff, to Blakely in particular, and whether or not they are sufficiently related in time, or otherwise, to establish the causation element. The analysis is much simpler. Namely,

> where a supervisory employee with the power to hire, fire, demote, transfer, suspend, or investigate an employee is ***shown to have used that authority to retaliate for the filing of a charge of sexual harassment, the plaintiff need not also prove that the employer participated in or knew or should have known of the retaliatory conduct*** to hold the employer liable.

*Cross v. Cleaver*, 142 F.3d 1059, 1074 (8th Cir.1998) (emphasis added); *see also Vance, 133 S. Ct. at 2442* ('[A]n employer is vicariously liable 'when a supervisor takes

15

a tangible employment action . . . " (quotations omitted)).

Thus, because it is alleged that Hudson, himself, terminated the plaintiff's employment within days of her reporting the harassment to Paden, issues of proximity in time between any corporate knowledge of the harassment and her termination, melt away.

The defendant does not argue any legitimate, non-discriminatory rationale or contend the plaintiff lacks evidence of pretext. Its argument ends at the *prima facie* stage. The plaintiff has established one.

The retaliation claim should proceed, therefore.

## **CONCLUSION AND RECOMMENDATION**

Wherefore, based upon the foregoing, the Court recommends that the defendant's motion for summary judgment [Doc. 33] be denied.

IT IS SO RECOMMENDED.


                                        s/Bruce H. Hendricks
                                        United States Magistrate Judge

January 22, 2013
Charleston, South Carolina.

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).